UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

CLEARWATER COUTY, IDAHO,
et al.,

           Plaintiffs,

    v.

UNITED STATES FOREST SERVICE,
et al.,

        Defendants.

Case No. 1:13-CV-00519-EJL

**MEMORANDUM DECISION
AND ORDER**

**INTRODUCTION**

Pending before the Court in the above-entitled matter are the Cross-Motions for Summary Judgment filed by the parties in this environmental case. The Motions are fully briefed and ripe for the Court's consideration. The Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the decisional process would not be significantly aided by oral argument, the Motions are decided on the record without a hearing. For the reasons stated below, the Court grants the Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Clearwater County and Idaho County, have brought this action against the Defendants the United States Forest Service ("Forest Service"); Clearwater National Forest; Faye Kruger, Regional Forester, Northern Region; and Rick Brazell, Forest Supervisor for the Clearwater National Forest. Plaintiffs challenge the Forest Service's August 2011 Final Environmental Impact Statement ("FEIS") and November 11, 2011 Record of Decision ("ROD") wherein the Forest Service proposes implementation of the Clearwater National Forest Travel Management Plan ("Travel Plan") and selection of the chosen action alternative, Alternative C Modified, designating motorized roads and trails in the Clearwater National Forest ("CNF"). (Dkt. 1.)[1] In particular, Plaintiffs dispute the Forest Service's closure of approximately 200 miles of trail to motorized use where such use was previously allowed as well as other restrictions on open motorized use, bicycle use, and snowmobile use in the CNF. (Dkt. 1 at ¶ 2.) Plaintiffs seek declaratory and injunctive relief setting aside the ROD and Travel Plan and remanding the matter for further analysis.

Plaintiffs' claims are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, alleging the Defendants' violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; National Environmental Policy

---

[1] This Court previously considered challenges to the same Travel Plan, FEIS, and ROD in *Friends of the Clearwater, et al., v. U.S. Forest Serv.*, Case No. 3:13-cv-00515-EJL, 2015 WL 1119593 (D. Idaho March 11, 2015). In that case, the Court remanded the matter to the Forest Service for reconsideration and further evaluation as to the Forest Service's conclusion that the Travel Plan was consistent with the Forest Plan and the Forest Service's compliance with the minimizing criteria requirements. *Id.*

Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.; National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*.; the Wilderness Act, 16 U.S.C. § 1131 *et seq*.; the 2005 Travel Management Rule; and the implementing regulations of these statutes, including the Forest Plan for the CNF. (Dkt. 1.) Defendants counter that their decisions and actions were in accord and fully complied with the applicable standards and requirements of these statutes. (Dkt. 22.) Both parties have filed Motions for Summary Judgment. (Dkt. 57, 65.)[2] Three organizations have intervened as Defendants in this matter – Great Burn Study Group, Idaho Conservation League, and The Wilderness Society (collectively "Intervenors") – and have jointly filed briefing on the summary judgment motions as well. (Dkt. 59, 66, 72.) The Court finds as follows.

## STATUTORY FRAMEWORK

### 1.    NEPA

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath–Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA serves two fundamental purposes: (1) to require agency consideration of detailed information concerning significant environmental impacts; and (2) to ensure that

---

[2] On July 14, 2014, this case was stayed in light of the proceedings in a related case, *Idaho State Snowmobile Ass'n v. U.S. Forest Service* ("*ISSA*"), Case No. 3:12-cv-00447-BLW, 2015 WL 807104 (D. Idaho Feb. 26, 2015). (Dkt. 31.) The *ISSA* case involved a challenge to the same Travel Plan at issue in this case with regard to its restrictions on motorized use in recommended wilderness areas ("RWA"). That case was later settled with the Travel Plan being remanded to the Forest Service for further review of the motorized and over snow vehicle access in RWA's. The stay in this case was lifted on April 27, 2016. (Dkt. 58.)

the public can both access and contribute to that body of information via comments. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006) (citation omitted). NEPA "does not mandate particular results, but simply describes the necessary process" that an agency must follow in issuing an EIS. *Kettle Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107, 1116 (E.D. Wash. 2001) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). NEPA is designed to ensure that federal agencies take a "hard look" at the environmental consequences of a proposed federal agency action. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Taking a "hard look" requires the agency to consider "all foreseeable direct and indirect impacts" as well as discuss "adverse impacts that do[] not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007) ("[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.") (internal quotation marks omitted).

2. **NFMA**

NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. Congress enacted NFMA to "serve the national interest" by ensuring that "renewable resource program[s] [for the National Forests] [ ] be based on a comprehensive assessment of present and anticipated uses, demand for, and supply of renewable resources

from the Nation's public and private forests and rangelands," and that the agency manage the national forest system so as to provide multiple use and sustained yield opportunities. 16 U.S.C. § 1600(3). "NFMA requires the Forest Service to develop comprehensive management plans for each unit of the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143, 1149 (9th Cir. 2010); *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i))). "In developing and maintaining each plan, the Forest Service is required to use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." *Greater Yellowstone*, 628 F.3d at 1149 (citation and quotations omitted); see also 16 U.S.C. § 1604(b).

**3.     FLPMA**

FLPMA's purpose is to manage public lands for "multiple use, [ ] with an increased emphasis on the management of the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 478 (9th Cir. 2010) (citing 43 U.S.C. § 1701(a)(8)). FLPMA also provides that the "public lands be managed in a manner that...will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

## STANDARD OF REVIEW

Judicial review of administrative agency decisions is made under the APA. 5 U.S.C. § 702. Such review is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). APA claims may be resolved via summary judgment pursuant to the standard set forth in Rule 56. *See Nw. Motorcycle Ass'n v. United States Dept. Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The APA requires that the agency action be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *League of Wilderness Defs. Blue Mnts. Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

There are two standards governing review of agency actions under the APA. *See Price Rd. Neighborhood Ass'n, Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th Cir. 1995). Factual disputes implicating substantial agency expertise are reviewed under the arbitrary and capricious standard and legal issues are reviewed under the reasonableness standard. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citations omitted). These standards reflect the axiomatic distinction between "the strong level of deference we accord an agency in deciding factual or technical matters [and] that to be accorded in disputes involving predominantly legal questions." *Price Rd.*, 113 F.3d at 1508. ). Both standards may be applied in the same case to different issues.

An agency's factual decision will be deemed arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Wildland CPR, Inc. v. United States Forest Serv.*, 872 F.Supp.2d 1064, 1074-75 (D. Mont. 2012) (quoting *Gardner v. United States BLM*, 638 F.3d 1217, 1224 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). That is to say, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." *Price Rd.*, 113 F.3d at 1508.

The scope of review under the arbitrary and capricious standard is narrow and courts do not substitute their judgment for that of the agency. *MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Western Watersheds Proj. v. United States BLM*, 181 F.Supp.3d 673, 677 (D. Ariz. 2016) (citation omitted). The arbitrary and capricious standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotations and citations omitted). When applying this standard, courts grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing certain agency activities. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) (quoting *Nat. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004) ("Where scientific and technical expertise is necessarily involved in agency decision-

making, ... a reviewing court must be highly deferential to the judgment of the agency.")).

"Where the question presented for review is a factual dispute which implicates 'a high level of technical expertise' we defer to 'the informed discretion of the responsible federal agencies.'" *Bahr v. United States EPA*, 836 F.3d 1218, 1229 (9th Cir. 2016) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). The APA's "highly deferential standard" of review "is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League of Wilderness Defs.*, 615 F.3d at 1130.

Nevertheless, even as to factual and technical matters, the agency must still examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *MotorVehicle*, 463 U.S. at 43 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted); *see also Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The court may not overturn an agency decision simply because it disagrees with the decision or with the agency's conclusions about environmental impacts. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action.") (citation omitted).

When a dispute is primarily legal in nature, or concerns a threshold question of law, this Court applies the more lenient, but less deferential, "reasonableness" standard. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 449 F.3d 1016, 1028 (9th Cir. 2006) (citing *Alaska Wilderness Rec. & Tourism Ass'n*, 67 F.3d at 727 (reviewing predominately legal issue for reasonableness because "it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominately legal questions"); *Ka Makaniʻo Kohala Ohana, Inc. v. Dept. of Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) ("Because this case involved primarily legal issues ... based on undisputed historical facts, we conclude that the 'reasonableness' standard should apply to this case.")). The "reasonableness" standard of review, applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. *Kettle Range*, 148 F.Supp.2d at 1116 (citation omitted). Under this standard, the Court will uphold the agency's decision unless it is unreasonable. *Friends of the Earth v. Hintz*, 800 F.3d 822, 836 (9th Cir. 1986).

## DISCUSSION

### 1. Standing

Defendants challenge the Plaintiffs' standing to bring their claims arguing they have failed to demonstrate an actual or imminent injury resulting from the approval of the Travel Plan. (Dkt. 65, 71.) In particular, Defendants point out the Plaintiffs have not filed anything, beyond the allegations in their Complaint, sufficient to establish standing at the summary judgment stage. (Dkt. 71.) Plaintiffs counter arguing the allegations in their Complaint adequately demonstrate standing and, additionally, that they have procedural

standing based on their allegations that the Forest Service failed to coordinate with the counties and failed to provide the counties with the requisite notice and opportunity to participate in the process. (Dkt. 69 at 5-7.)

Article III of the United States Constitution restricts judicial power to deciding actual cases and controversies. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Thus, the doctrine of standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Id.* (citations and quotations omitted). Plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To satisfy Article III's standing requirements, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Def. of Wildlife*, 504 U.S. at 560–61); *see also Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013). A plaintiff bringing suit challenging a statutory provision under the APA must also show that its alleged injury falls within the "zone of interests" that the statute was designed to protect. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) (citing *Douglas Cnty. v. Babbit*, 48 F.3d 1495, 1499-1500 (9th Cir. 1995)). To survive a motion for summary judgment raising standing, the counties must set forth "specific facts" by affidavit or by other admissible evidence

MEMORANDUM DECISION AND ORDER -10

demonstrating that they have suffered an "injury in fact" as a result of the agency's action. *Friends of the Earth*, 528 U.S. at 180–81; *see also Def. of Wildlife*, 504 U.S. at 561 (In responding to a summary judgment motion, the plaintiff must set forth by affidavit specific facts to show that it has Article III standing.).

The Plaintiffs argue the allegations in the Complaint establish their concrete interests and particularized actual harm, to both the Counties themselves and the individual citizens who reside or are employed in the Counties, resulting from the Defendants' decision adopting the Travel Plan. (Dkt. 1 at ¶ 15) (Dkt. 69 at 5-7.)[3] Such harm can be remedied, Plaintiffs allege, if the Court were to overturn the Defendants' decision concerning the Travel Plan. (Dkt. 1 at ¶ 16.) In responding to a summary judgment motion, however, Plaintiffs can "no longer rest on such 'mere allegations,' but must 'set forth' by

---

[3] The Complaint states the basis for standing is that approximately ninety percent of the CNF lies within the jurisdictional boundaries of Idaho County, Idaho, with a small portion lying within Latah County, Idaho and Shoshone County, Idaho. (Dkt. 1 at ¶ 12.) The Complaint goes on to allege:

> The Forest is an integral part of the livelihoods and recreation of the citizens of Clearwater County and Idaho County, and accounting for nearly three-quarters (¾) of the total jobs within Clearwater County. The Forest provides a significant portion of the revenue, both through recreation and timber harvest, which results in a significant portion of the tax base supporting Clearwater County and Idaho County. The Travel Plan restricts and eliminates motorized use of portions of the Clearwater National Forest and provides for management of portions of the Forest as wilderness area, and therefore impacts the recreational opportunities and income, and the vocational opportunities and income of residents of Clearwater County and Idaho County, together with the tax base of Clearwater County and Idaho County.

> Clearwater County and Idaho County share jurisdiction over the Forest for those portions lying within the County boundaries. Clearwater County has engaged in land use planning activities which are being ignored or invalidated by the Forest as a result of the Travel Plan.

(Dkt. 1 at ¶¶ 13-14.)

affidavit or other evidence 'specific facts,'...which for purposes of the summary judgment motion will be taken as true." *Def. of Wildlife*, 504 U.S. at 561. No affidavits or other evidence have been provided in this case by Plaintiffs that set forth "specific facts" supporting their allegations. Therefore, the Court finds the Plaintiffs have failed to establish Article III standing. For the same reason, the Court finds Plaintiffs have also failed to show procedural standing.

Plaintiffs argue their claims alleged the Defendants violated the procedural rules of several federal statutes giving them "procedural standing." (Dkt. 69 at 5-7.) Where the claims allege procedural injuries – i.e., the defendants violated various federal statutes and regulations resulting in injuries to plaintiffs – procedural standing may exist. To establish statutory standing, a plaintiff alleging a procedural injury must first show that the agency procedures in question were designed to protect a threatened concrete interest that is the "ultimate basis" of its standing. *Cantrell*, 241 F.3d at 679 (citing *Def. of Wildlife*, 504 U.S. at 573 n. 8). This requires a showing that (1) the agency violated certain procedural rules, (2) those rules protect the plaintiff's concrete interests, and (3) it is reasonably probable that the challenged action will threaten the plaintiff's concrete interests. *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003). A plaintiff shows injury to a "concrete interest" when the plaintiff "will suffer harm by virtue of [its] geographic proximity to and use of areas that will be affected" by the challenged agency action. *Id.* at 971. For procedural standing, once the plaintiff has established a "reasonable probability" that the challenged action threatens its concrete interest, the "inquiry into the imminence of the threatened harm is less demanding… and the causation and redressability

requirements are relaxed." *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. United States Dept. of Interior*, 767 F.3d 781, 789-90 (9th Cir. 2014) (quoting *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) and *Cantrell*, 241 F.3d at 682).

Here again, Plaintiffs have not come forward with any affidavits or evidence beyond the allegations in their Complaint to satisfy their burden to show procedural standing. This is fatal to Plaintiffs' cause of action at the summary judgment stage.[4]

Despite the fact that standing has not been shown, for the sake of completeness, the Court has considered the merits of the Plaintiffs' claims and, for the reasons stated below, grants Defendants' Motion for Summary Judgement.

## 2.    The Clearwater National Forest Plan

The CNF lies in north-central Idaho and comprises 1,827,380 total acres of forest lands offering a mix of diverse outdoor opportunities to its visitors including camping, hunting, hiking, skiing, biking, off-road vehicular travel, fishing, whitewater boating, and bird/nature viewing. (Dkt. 1 at ¶ 8.) Approximately half of the CNF, 950,311 acres, are designated as inventoried roadless areas ("IRA"). (AR 3343.) 198,200 acres of the IRAs have been deemed Recommended Wilderness Areas; meaning they are candidates for prospective Wilderness designation by Congress. (AR 3342.) The CNF is also home to many species of animals and fish as well as their habitats.

---

[4] The cases cited by Plaintiffs are distinguishable because both involved standing challenges on motions to dismiss unlike here where the case is at the summary judgment stage. *See American Independence Mines and Minerals Co. v. U.S. Dept. of Ag.*, 733 F.Supp.2d 1241 (D. Idaho Dec. 16, 2010); *Valley Cnty., Idaho v. U.S. Dept. of Ag.*, 2012 WL 506000 (D. Idaho Feb. 15, 2012).

In 1987, the Forest Service approved the Forest Plan which set forth goals and objectives for multiple resource management in the CNF as well as standards and guidelines for specific activities and projects. (AR 42365, 42885.) In 2005, the Forest Service published the Travel Management Rule, 36 C.F.R. §§ 212.1-261.55, which mandates certain changes to the management of motor vehicle use on National Forest System lands. Prior to the Travel Management Rule, motor vehicle use on public lands was largely unregulated resulting in uncontrolled cross-country motor vehicle use, unplanned routes, and damage to the resources. The Travel Management Rule was instituted to eliminate cross-country motor vehicle use by requiring designation of routes and areas for motor vehicle use. *See* 36 C.F.R. §§ 212.50(b), 212.55. The designated routes are displayed on a Motor Vehicle Use Map ("MVUM") which is annually updated and provided to the public. Any motor vehicle use inconsistent with the MVUM is prohibited. *See* 36 C.F.R. § 261.13.

In response to the Travel Management Rule, the Forest Service compiled the August 2011 FEIS and November 2011 ROD, as well as the related materials in the Administrative Record, for the CNF that are at issue in this case. These documents identify the alternative selected by the Forest Supervisor for the CNF as Alternative C Modified which establishes the Travel Plan with a system of designated routes for motorized uses, which Defendants

argue, provides the best mix of motorized and non-motorized opportunities in the CNF and proposes an amendment to the Forest Plan. (AR 3308, 3321.)[3]

### 3. Forest Service Requirement to Coordinate with the Counties

Plaintiffs' first claim alleges the Forest Service failed to coordinate with the Counties as required by the Travel Management Rule, the Forest Plan, NEPA, NFMA, and FLPMA. (Dkt. 1) (Dkt. 61 at 1-16.) Defendants respond arguing Plaintiffs waived this claim and, regardless, the Forest Service properly coordinated with the counties. (Dkt. 65 at 11-23.)

#### A. Waiver of the Failure to Coordinate Claim

Defendants argue the Plaintiffs waived their failure to coordinate claims by not raising those claims during the NEPA process; specifically, by failing to raise the claims before the ROD was issued. (Dkt. 65 at 12-15) (Dkt. 71 at 6-7.) Plaintiffs counter that the coordination requirements are mandatory and procedural upon the Forest Service and, therefore, their claims are not barred or waived. (Dkt. 69 at 8-9.) Regardless, Plaintiffs assert they raised the coordination issue during the NEPA Process. (Dkt. 69 at 9-10.)

The Court need not address this issue because it concludes the Defendants adequately satisfied any requirement that it coordinate with the Counties in this case.

---

[3] The Forest Plan amendment proposed in Alterative C Modified, and common to all action alternatives, would modify the periods of restriction for on-road use described in Appendix F of the 1987 Forest Plan. (AR 3328, 3347, 3358-59.)

**B. Adequacy of the Forest Service's Coordination with the Counties**

Clearwater County contends the Defendants' violated the statutory and procedural requirement that they coordinate with the County and conduct a consistency analysis which considers the 2011 Clearwater County Comprehensive Plan for land use ("Comprehensive Plan"). (Dkt. 61 at 9-11) (AR 40633-40891.) Idaho County argues it was not afforded adequate notice and opportunity to be heard regarding their concerns for the Travel Plan and that they should have been afforded "coordinating status." (Dkt. 61 at 11.) Defendants dispute the level of coordination required for the Travel Plan and, further, maintain they adequately coordinated with the Counties during the process. (Dkt. 65 at 15-24) (Dkt. 71 at 10-12.)

**i. Coordination Required**

Plaintiffs assert the overall regulatory framework of NFMA, NEPA, FLPMA, and the corresponding regulations required Defendants to have coordinated with the Counties in this case during the travel planning process. (Dkt. 69 at 10-13.) Defendants argue the statutes and regulations cited by Plaintiffs do not require the level of coordination the Plaintiffs claim should have been applied here to the Travel Plan.

The statues applicable here require the agency to perform some level of coordination with local governments when deciding on a federal project that will impact the localities. The 2005 Travel Management Rule, Forest Plan, and Forest Manual direct the Forest Service to coordinate with counties concerning travel planning. *See* 36 C.F.R. § 212.53 and (AR 42411, 28300-01.) NEPA requires federal agencies to "cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and

MEMORANDUM DECISION AND ORDER -16

local requirements." 40 C.F.R. § 1506.2(b). Such cooperation should include joint planning, environmental research and studies, public hearings, and environmental assessments. *Id*. NFMA mandates that the Forest Service "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies." 16 U.S.C. § 1604(a).

### ii. Adequacy of Defendants' Coordination

Defendants maintain they have adequately coordinated with the Counties in developing the Travel Plan by contacting the Counties early in the planning process, meeting numerous times with the Counties' Commissioners, and taking the Counties' input into consideration. (Dkt. 65 at 12-13) (Dkt. 71 at 10-12.) Plaintiffs disagree arguing the Forest Service failed to adequately coordinate with the Counties. (Dkt. 61 at 9.)

The Court finds the Defendants appropriately coordinated with the Counties in this case. The Counties were part of the planning process for developing the Travel Plan. Plaintiffs had notice and an opportunity to be heard during the process and both Counties submitted comments to the DEIS during the process. (AR 2536, 3356, 3358, 5755-56, 5760-61, 5763, 5765-66, 14522-23, 40913-14, 40946-47.) In fact, Plaintiffs raise many of the same arguments in this case that they also made to the Forest Service during the NEPA process. That the Defendants considered input from the Counties is evidenced by the administrative record as well as the fact that they developed Alternative C Modified to include more trails open to motorized use in response to the comments received from the Counties and others. (AR 40898-99.) Ultimately, Defendants adopted Alternative C

MEMORANDUM DECISION AND ORDER -17

Modified. While that alternative was not preferred by the Counties, it is also not inconsistent with the Comprehensive Plan.[5] Further, the Court disagrees with Plaintiffs argument that Defendants are required to choose the planning option that is the "most consistent" with local law or policy that does not violate any other statute or rule. (Dkt. 61 at 11.) Nothing in the statues, rules, or regulations applicable here demand that of the Defendants' travel planning decision, nor is there any requirement that the Defendants' choose the outcome preferred by the Counties. That the Counties disagree with the Defendants' decision does not mean the Travel Plan should be set aside. What is required is that Defendants provide notice and an opportunity for the Counties to be involved in, comment on, and cooperated with during the process of developing the Travel Plan. The Court finds Defendants satisfied those requirements in this case.

As to Idaho County's argument that the Counties should have been granted "coordinating status" and afforded greater opportunities for input and consideration from the Forest Service, the Court finds the Defendants satisfied any requirements that they consult and/or coordinate with the Counties. (Dkt. 61 at 11) (quoting 36 C.F.R. § 212.53); (AR 3512-13.) A non-federal agency, such as a State or local agency, "may request the lead agency to designate it a cooperating agency," 40 C.F.R. § 1501.6 (emphasis added),

---

[5] Defendants maintain they had no duty to discuss inconsistencies between the Travel Plan and the Comprehensive Plan as Plaintiffs have not identified any inconsistencies. (Dkt. 65 at 18.) The Court agrees. The Plaintiffs' arguments are broad policy based claims that fail to identify any actual inconsistency between the Travel Plan and the Comprehensive Plan. To the extent any inconsistency is determined to exist, this Court's review of the record is that the Forest Service's discussions in the ROD and FEIS of its reasoning, explanation, and basis for it decision adopting Modified Alternative C addresses any such inconsistency. Specifically, the discussions concerning the reasons underlying the roads and trails open to motorized use in the selected alternative.

MEMORANDUM DECISION AND ORDER -18

and "may by agreement with the lead agency become a cooperating agency," 40 C.F.R. §

1508.5 (emphasis added). Whether to grant a non-federal agency's request for cooperating-

agency status is discretionary with the Forest Service and is not judicially reviewable under

the APA. *See Wyoming v. United States Dept. of Ag.*, 661 F.3d 1209, 1242 (10th Cir. 2011).

Accordingly, the Court denies the Plaintiffs' Motion for Summary Judgement on this basis.

The Forest Service provided the Counties with notice and several opportunities to

comment and participate in the NEPA process, including several meetings between the

Forest Service and Counties directly. Additionally, the record demonstrates that the Forest

Service considered the concerns and input provided by the Counties. For these reasons,

the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion

for Summary Judgment on the first claim.

### 4. Forest Service's Decision as to the Recommended Wilderness Areas and Management Area B2

Count Two of the Complaint alleges the Forest Service's decision to exclude

motorized and mechanical vehicles from all Recommended Wilderness Areas ("RWAs"),

specifically Management Area ("MA") B2, is inconsistent with the Forest Plan, is arbitrary

and capricious, lacks proper studies, and improperly creates a "de-facto wilderness." (Dkt.

1.) Plaintiffs make legal and factual arguments in support of their claim. Defendants

maintain the Forest Service properly manages the RWAs as MA B2 and they conducted

the appropriate studies in making their decision restricting motorized access in RWAs.

(Dkt. 65 at 24-32.)[6] Intervenors also argue the Forest Service's decision to maintain the wilderness character of the RWAs is not arbitrary or capricious, is consistent with the Forest Plan, is supported by sound scientific evidence, and is based on the agency's expertise. (Dkt. 66.)

Plaintiffs' legal argument contends the area should be managed as MA A3 because Congress has not designated the area as wilderness despite having been presented with seven pieces of legislation proposing to do so since the Forest Plan was adopted. (Dkt. 61 at 18-22.) Defendants interpret the Forest Plan to require that it manage RWAs as MA B2 until "Congress makes classification decisions." (Dkt. 71 at 13.)

The Forest Plan's forest-wide management direction for wilderness areas is found in Chapter II and states:

> Refer to the Forest Plan map for recommended additions to the National Wilderness Preservation System. In the event Congress does not classify these areas as wilderness system additions, they will be assigned to the nonwilderness Management Area A3. Manage recommended additions to the wilderness system to prevent changes in character which would be inconsistent in wilderness until Congress makes classification decisions.

(AR 42400.)

---

[6] Defendants also contend the settlement in the *ISSA* case requires issuance of a new decision for the Travel Management Plan regarding over snow and motorized access management for RWAs in the CNF which will render the Plaintiffs' arguments challenging the motorized use restrictions on RWAs in the current Travel Plan moot. (Dkt. 65 at 24 n. 8) (Dkt. 66 at 9 n. 3) (Dkt. 71 at 14 n. 3) (Dkt. 72 at 5 n. 1.) The June 1, 2017 status report in the *ISSA* case reflects that the Forest Service is in the final stages of finalizing its revised decision but has not yet issued that decision. *ISSA*, Case No. 3:12-cv-00447-BLW, Status Report Dkt. No. 84 (D. Idaho May 1, 2017). Accordingly, the issue is not yet moot and this Court will address the same.

Chapter III of the Forest Plan provides the various management goals, management standards, schedule of anticipated management practices, and monitoring requirements for each of the seventeen management areas in the CNF. (AR 42419.) The wilderness standards for MA B2, recommended wilderness, are:

a.  Incorporate specific management direction as Forest Plan amendments upon classification of the areas for wilderness.

b.  Prepare for any roadless area established as wilderness by Congress within three years of the date of that establishment (unless otherwise directed)…

c.  If there is Idaho wilderness legislation during the Plan period, the area(s) that is (are) not classified for wilderness by Congress will remain roadless and be managed as management area A3 until the next major revision of the Forest Plan, unless specified other wise by the Wilderness legislation.

(AR 42455.)

The Forest Plan for the CNF requires that RWAs be managed "to protect [their] wilderness character" and that the Forest Service "manage all uses to maintain wilderness qualities and retain semiprimitive settings." (AR 42454.) One of the Forest Plan's goals is to maintain "potential wilderness values on those areas that are being recommended for classified wilderness." (AR 1993, 42378.) The Forest Service Manual's direction for RWAs states that RWAs are "not available for any use or activity that may reduce the wilderness potential of an area. Activities currently permitted may continue, pending designation, if the activities do not compromise wilderness values of the area." *See* Forest Service Manual § 1923.03(3); (AR 39542.).

The Forest Service interprets the Forest Plan to require it to manage the RWAs to prevent changes in character inconsistent with wilderness until Congress makes a classification decision. (AR 39542) (Recommendation on Administrative Appeal concluding the Forest Service is in compliance with the Forest Plan, NFMA, and the Wilderness Act in deciding to disallow motorized and mechanized use in the Fish Lake Trail RWA of the CNF.) The Court finds that interpretation and the Forest Service's application of this standard is reasonable and entitled to deference. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 947 (9th Cir. 2014); *Earth Island Institute v. United States Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (quoting *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) ("The Forest Service is 'entitled to deference to [its] interpretation of [its] own ... Forest Plans,' unless the interpretation 'is plainly inconsistent with [a Forest Plan].'")). Here, the Forest Service's interpretation of the Forest Plan reasonably articulated and is soundly based on the language, standards, and direction provided for in the Forest Plan and Forest Service Manual.

Likewise, the Court finds the Forest Service is reasonable and correct in its interpretation of the Forest Plan that RWAs do not revert to MA A3 if not designated as wilderness within ten years of the Forest Plan's approval. The Forest Plan clearly states it remains "valid until it is revised" which has not yet been completed. (AR 42374.) The RWAs remain managed as MA B2 until Congress acts. Under Chapter II of the Forest Plan, RWAs are assigned as MA A3 only if and when Congress acts to not classify them as wilderness system additions. (AR 42400.) Congress has not acted on the RWAs in the

MEMORANDUM DECISION AND ORDER -22

CNF. The proposed legislation cited by Plaintiffs were for areas outside of the CNF and/or were never enacted by Congress. Until Congress acts either to not classify or to classify an area as wilderness, the Forest Service's interpretation that RWAs are maintained as MA B2 is correct and reasonable based on the Forest Plan's goals and standards as well as the Forest Service Manual.

Plaintiffs' factual argument is that the Forest Service's recommendation to treat RWAs as MA B2 is arbitrary and capricious because it failed to conduct the proper fact finding or studies upon which to 1) determine the actual level of use in the areas and 2) differentiate historical use levels from current use levels. (Dkt 61 at 22-24.) Prohibiting all motorized use in RWAs, Plaintiffs argue, ignores historic motorized use recognized by this Court in *Friends of the Clearwater* and improperly moves the RWA to actual wilderness without proper Congressional approval or supporting statistical basis.

In *Friends of the Clearwater*, this Court noted that the CNF Forest Plan does not prohibit motorized use in the RWAs of the CNF and there has historically been some recreational motorized use in MA B2. *Friends of the Clearwater*, 2015 WL 1119593, at *12. The plaintiffs in that case argued there was too much motorized use allowed in the RWAs. There the Court held that the Forest Service did not act arbitrarily or capriciously in deciding to allow some managed motorized access in RWAs. The countervailing argument is raised in this case with Plaintiffs here arguing the Forest Service's decision is arbitrary and capricious because it designates a majority of the RWAs as non-motorized; i.e., there is not enough motorized use allowed in the RWAs.

Having reviewed the record in this case, the Court finds the Forest Service's decision regarding management of RWAs as MA B2 is not arbitrary or capricious. As the Court concluded in the prior case, so too here, the Court finds the Forest Service provided a reasoned analysis of this issue in both the ROD and FEIS evidencing that it considered the environmental impacts of its decision after weighing the relevant data and materials.[7] The record supports the Forest Services' reasoning and conclusion. *See Bahr*, 836 F.3d at 1229.

Further, the Court finds the additional count studies the Plaintiffs argue should have been conducted are unnecessary in order for Defendants to satisfy NFMA. The FEIS addressed motorized and bicycle trail use noting there has been some historical use and although neither use is "extensive" in RWAs, motorized and bicycle trail use in RWAs is increasing. (AR 2593-94, 2634-35, 2643-44.) Despite not having actual count number studies sought by Plaintiffs, the Court finds the Forest Service discussed historical use and then gave a reasonable explanation for the lack of historical data, the current trends in trail uses, and its reasons for deciding to limit such uses in RWAs in order to protect the wilderness characteristics and maintain the wilderness qualities of the RWAs. (AR 2634-35, 2643-44.) Moreover, the Court finds the Forest Service has the discretion as to how to

---

[7] The FEIS recognizes that the documentation in the Forest Plan file "assumed these [RWA] would be managed with no motorized use" and that non-motorized, recreational use was the desired future condition for the RWAs. (AR 2634–35.) In discussing the alternatives consistency with the Forest Plan, the FEIS again notes that the desired condition or goal of MA B2 is to "Manage each recommended wilderness to protect its wilderness character." (AR 2634, 2641–45.) The FEIS also notes that the planning record states it was assumed the conditions, which did not restrict off-road vehicle use, use would "remain unchanged." (AR 2634–35.)

maintain RWAs which may include limiting motorized use in order to satisfy the Forest Plan's minimum requirements for conservation. (AR 42397) ("Forestwide standards…and management area standards…should be considered as minimum requirements that must be met. However, they are minimums so they may be exceeded."). Consistent with the Forest Service Manual, activities currently permitted in an RWA may be allowed to continue pending designation so long as they do not compromise the wilderness values of the area. (AR 9542.) While there has historically been motorized and bicycle trail use in the RWAs, the Forest service has articulated a reasonable and well supported basis for why those activities are inconsistent with the wilderness values of the area and, therefore, must now be limited or eliminated from RWAs. For these reasons, the Defendants' Motion for Summary Judgment is granted on this claim.

## 5.    Forest Service's Decision regarding Management Areas C1, C6, and C8S

Count Three of the Complaint alleges the Forest Service violated the Forest Plan and acted arbitrarily and capriciously with regard to its decisions in MAs C1, C6, and C8S. (Dkt. 1.) Plaintiffs argue the Forest Service applied the wrong Forest Plan standards and failed to conduct proper studies. (Dkt. 61 at 29-33) (Dkt. 69 at 19.) Defendants assert the Forest Service complied with the Forest Plan in designating routes and trails in MAs C1, C6, and C8S and was not required to conduct further studies. (Dkt. 65 at 36-41.)[8]

---

[8] This claim encompasses a portion of the *Friends of the Clearwater* decision where this Court held that the Forest Service "failed to demonstrate that it selected motorized routes 'with the objective of minimizing their effects.'" *Friends of the Clearwater*, 2015 WL 1119593, at *15. The Court remanded the matter to the Forest Service to further analyze and discuss how it applied the minimizing criteria. *Id.* at *16-17. In defending against the claim in this case, the Forest Service

## A.     Forest Plan Standard

Plaintiffs argue the decision to limit motorized travel in these MAs is arbitrary and capricious because it is based on the wrong standard. (Dkt. 61 at 31.) Defendants maintain the correct Forest Plan standard was applied in deciding to limit motorized use in these MAs. (Dkt. 65 at 37.)

As to MA C1 and C6, Plaintiffs argue the standard that should have been applied is "To provide for high quality dispersed recreation in a semi-primitive motorized setting, so long as such use does not 'prevent achievement of fish and wildlife management goals.'" (Dkt. 61 at 31-32.) Plaintiffs' argument draws a distinction between asking whether closing trails is necessary to <u>prevent</u> management goals as opposed to whether closing trails will <u>enhance</u> a goal. Defendants assert the proper standard was applied to MA C1 and C6. (Dkt. 65 at 37-40.)

The Forest Plan recreation standard for MA C1 is: "Manage for dispersed recreation in a semiprimitive motorized setting oriented to big-game hunting activities." (AR 42458.) The facilities standards are: 1) "Do not construct new Forest system roads" and 2) "Permit trail bike use on trails to extent that use does not damage trials, result in unsafe conditions for other users, or prevent achievement of fish and wildlife management goals." (AR 42460.) The fish and wildlife management goal, as applicable here, is to "Rehabilitate big-game habitat…as needed to provide optimum habitat conditions." (AR 42458.) The

---

argues it has complied with the Forest Plan without relying on its application of the minimizing criteria consistent with the *Friends of the Clearwater* decision and remand. (Dkt. 65 at 37 n. 14.)

overarching goal of MA C1, applicable here, is to "[m]anage to maximize big-game summer habitat potential. Manage without roads to provide minimum disturbance to big-game animals" and "[p]rovide for high quality dispersed recreation in a semiprimitive motorized setting." (AR 42458.) Similarly, the Forest Plan standards for MA C6 relevant here are for the management of "dispersed recreation in a semiprimitive motorized setting" while rehabilitating "big-game habitat…as needed to provide optimum habitat conditions." (AR 42468.) MA C6's facilities standard is substantively similar to MA C1. (AR 42469.)

The standards for MA C1 and C6, therefore, require the Forest Service to manage these areas so as to balance motorized recreational use while protecting big-game habitat and fish and wildlife goals. The Court finds the FEIS and ROD have properly applied these standards in selecting Alternative C Modified by balancing the important wildlife management goals, in particular with regard to the elk population, while also providing for some motorized trail use that is consistent with the goals of MAs C1 and C6. (AR 2814-15, 3344-45, 42458, 42468-69.) The FEIS and ROD establish that the Forest Service considered the correct goals and standards for these areas in making its decision and achieved an appropriate balance as required under the Forest Plan.

In MA C1, the ROD provides two trails will be open to use seasonally, one trail is open year round, and one trail is closed. The ROD specifically notes that MA C1 contains "the best big game summer range and most important elk calving areas in the Forest" and that "the most important goal for this area is to provide quality big game summer range." (AR 3344.) Balancing that goal with the need to provide motorized trail opportunities in the area, the decision closes all non-winter motorized uses on Trail 106 and imposes

seasonal restrictions on motorized use of Trails 191 and 691 and part of Trail 167 to avoid the primary elk calving and weaning periods. (AR 3344.)

For MA C6, the ROD notes it too has wildlife goals but is more focused on protecting water quality and fish habitats from the effects of human activity. (AR 3344.) As such, the ROD recommends restricting "nearly all motorized travel along the major streams of Cayuse, Rasberry and Monroe Creeks" in order to reduce the motorized traffic across stream fords. (AR 3345.) Motorized use in these areas is retained along the ridgelines.

As to MA C8S, Plaintiffs argue the ROD's decision restricting Trails 167 and 632 is based on the same erroneous wildlife standard applied to MAs C1 and C6 and is contrary to the Forest Plan Standard for MA C8S which allows for trail bike use until the area is roaded. (Dkt. 61 at 33.) The Forest Plan for this MA contains several standards relevant to this case. The recreational standard serves to provide "opportunities primarily for nonmotorized dispersed recreation in a roaded natural setting." (AR 42471.) The wildlife standard requires management of "big-game summer range for a minimum of 75 percent of elk habitat potential" and to "[a]void or provide mitigation for special wildlife areas such as big-game calving areas, wallows travel routes, and licks when designing roads and timber sales." (AR 42471-72.) The facilities' standards include transportation systems that avoid "big-game habitat components such as calving areas"; prohibiting motorized vehicles on all new roads except winter snowmobile use; and permitting trail bike use on suitable trials until the area is roaded, at which time the entire area will be closed to all public use of motor vehicles. (AR 42473.)

MA C8S has a combination of wildlife, fishery, timber, and recreation goals. (AR 3345.) To balance the competing wildlife and recreation goals, the ROD proposes eliminating motorized use on Trail 373 and restricting use on other trails – such as seasonal restrictions on Trails 167 and 632 - in order to retain large blocks of secured habitat while still allowing the primary loop routes to remain open to motorized use. (AR 3345-46.)

> In addressing user-suggested routes for the Travel Plan, the ROD states:

> In deciding which routes to adopt into the system [the ROD] relied on the primary goals for the [MA] where they were located. If the route contributed to those goals or moved the area toward the areas desired condition it would be adopted. Most of the suggestions, however, were in [MAs] like C1, C6, C8S, or B2 where a reduction in motorized traffic seemed to be warranted to address the goals for those management areas.

(AR 3348.) The ROD goes on to state "I believe backcountry motorized opportunities can be retained while minimizing effects on wildlife and wildlife habitat by completely avoiding the most sensitive areas, or by managing use seasonally to minimize the effects of motorized traffic. The selected actions represent the best possible way to provide motorized recreation opportunities while minimizing effects on wildlife habitat and moving wildlife resources closer to the goals and objectives outlined in the [Forest Plan]." (AR 3349-50.)

The Court finds the Forest Service's decision appropriately balances the correct standards for the MAs by providing motorized recreational opportunities while conserving big-game summer range and special wildlife areas by restricting motorized use on some trails. (AR 3345.) Alternative C Modified closes some trials, places seasonal restrictions on others, and allows use on certain trials to provide the rider's desired loop trail options.

Alternative C Modified was developed in response to "requests for more motorized loop trails, while minimizing effects on wildlife habitat in MAs C1, C6, and C8S by implementing seasonal restrictions on some trails." (AR 3319, 3321.) While the selected alternative includes some user-suggested motorized trials, it does not include user-suggested motorized routs in MAs C1, or C6 as motorized use would "run counter" to MA goals for those areas and restricts motorized use on most trails in MAs C1 and C6. (AR 3323-24.)

The ROD states that the "most important objective was to manage motorized uses as necessary to minimize potential adverse effects to Forest resources." (AR 3332.) As to MAs C1, C6, and C8S, the Forest Service's decision seeks to manage motorized use in those areas so as to "minimize effects on wildlife and fisheries resources while moving closer to goals and objectives in the Forest Plan." (AR 3332.) The ROD states that the selected alternative represents the best compromise to achieve the goal of moving resource conditions toward Forest Plan goals and objectives by striking the "best possible balance" between recreational opportunities and the various resources that may be affected by motorized travel. (AR 3333, 3352.)

The Court finds the Forest Service's decision articulated in the FEIS and ROD properly applies the Forest Plan standards applicable to MAs C1, C6, and C8S. These MAs are backcountry areas where elk populations have declined precipitously in the last two decades to being well below management objectives. (AR 2814-15.) The decision to close some trails to motorized use recognizes the need for big game summer range and habitat security in order to achieve management objectives for elk in these areas while still

allowing for motorized trail use in the areas. (AR 3352) (AR 2816, 2840-41, 2845-47.) The ROD includes a discussion of the rationale for the management decisions in MAs C1, C6, and C8S; discussing each area in turn given their notable differences. (AR 3344-46.)

Based on the foregoing, the Court finds the Defendants applied the correct Forest Plan standards in reaching its decision to adopt Alternative C Modified. Defendants' Motion for Summary Judgment is granted on this claim.

## B. Adequacy of Studies

The Plaintiffs assert the ROD is arbitrary and capricious because the decision is based on the number of users of trails, or other areas, without there being any study identifying the actual numbers of users and their impact/effect on the trails, environment, and wildlife. (Dkt. 61 at 29-33) (Dkt. 69 at 19.) Defendants dispute that the Forest Service was required to conduct such studies. (Dkt. 65 at 38-39.)

An agency has wide discretion to determine the best scientific and commercial data available for its decision-making. *See Southwest Ctr. for Biological Diversity v. United States Bureau of Rec.*, 143 F.3d 515, 523 n. 5 (9th Cir. 1998). What constitutes the "best" available science implicates core agency judgment and a high level of technical expertise to which courts must defer so long as that determination was not arbitrary and capricious. *Marsh*, 490 U.S. at 377 (citations and quotations omitted); *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council*, 462 U.S. 87, 103 (1983) (a court must be "at its most deferential" when an agency is "making predictions within its area of special expertise, at the frontiers of science"). In this regard, the Court does not substitute its judgment for that of the agency. *McNair*, 537 F.3d at 987. Instead, the Court looks only to whether the

agency's decision was based on a consideration of the relevant factors, whether there has been a clear error in judgment, and whether the agency articulated a satisfactory explanation for its action by giving a rational connection between the facts found and the agency's conclusions. *See Marsh*, 490 U.S. at 378, *Center for Biological Diversity v. Nat. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2013). Under the arbitrary and capricious standard of review, an agency's decision "need only be reasonable, not the best or most reasonable, decision." *River Runners for Wilderness*, 593 F.3d at 1070.

Here, the Court finds the Defendants' decision is not arbitrary or capricious. The Forest Service articulated a reasonable explanation for its decision that Alternative C Modified is the best management plan that balances the Forest Plan standards of providing recreational opportunities and protecting big-game habitat. The decisions regarding motorized use on particular trials are based on the location of the roads in relation to the elk habitat sought to be protected. There is ample data concerning the decline in the elk population, the impact of motorized trail use on the elk population, and the importance of secure elk habitat. A study of the actual numbers of trail users on a given trail, as sought by Plaintiffs, is not necessary in order for the Forest Service to have made its decision. The Forest Service's decision balances the competing standards of these MAs while taking into consideration the scoping comments. (AR 3346-51.) The Forest Service has articulated a reasonable basis for its decision and explained the rational connection between its decision and the relevant facts. For these reasons, the Court denies Plaintiffs' Motion and grants the Defendants' Motion for Summary Judgment on this claim.

6.      **Consideration of Economic Impacts on Local Governments/Communities**

Count Four of the Complaint alleges the Forest Service failed to consider the economic impact of the Travel Plan on local governments and communities. (Dkt. 1.) Plaintiffs argue both NFMA and NEPA, and their implementing regulations, require the Forest Service to consider the economic impact of its decision. (Dkt. 61 at 24-29.)[9] Defendants maintain they adequately analyzed the economic impacts. (Dkt. 65 at 33-36.)

The FEIS has a lengthy section discussing the social and economic impacts of the Travel Plan. (AR 2666-2716.) Attachment 2 of the ROD summarizes the agency's responses to comments made during the scoping concerning, as relevant here, economic impacts. (AR 3509.) Plaintiffs argue the FEIS is not a "true economic impact analysis" and that both the FEIS and ROD are based on outdated data and studies. Plaintiffs also assert the economic effects estimates are made without having conducted any studies as to the actual amount of forest use being eliminated or actual user count. (Dkt. 61 at 28-29.) As such, Plaintiffs argue, the Forest Service's analysis is based upon misleading economic assumptions.

The information contained within a NEPA document must be accurate in order to comply with "NEPA's purpose of providing decision makers and the public with an

_____

[9] Count Four of the Complaint cites only to NFMA. (Dkt. 1 at ¶ 60.) Plaintiffs' opening briefing, however, raises both NFMA and NEPA violations for Count Four. (Dkt. 61.) Defendants' response points out that the NFMA statute and regulations cited by Plaintiffs - 16 U.S.C. § 1604(b) and 36 C.F.R. §§ 219.1(a), 219.5, and 219.10 – relate to the processes for land management plans and, therefore, do not apply to Travel Plan at issue in this case. (Dkt. 65.) Plaintiffs appear to agree that NFMA does not apply as they address this argument only with regard to NEPA in their reply brief. (Dkt. 69 at 16-18.) Therefore, Court analyzes this argument only under NEPA.

accurate assessment of the information relevant to evaluate" the proposed action. *Natural Res. Def. Council v. United States Forest Serv.*, 421 F.3d 797, 812 (9th Cir. 2005). Inaccurate economic information in an EIS gives rise to a NEPA violation if it "'impair[s] the agency's consideration of the adverse environmental effects'" and "'skew[s] the public's evaluation.'" *Id.* at 811 (quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996)).

The Court finds the economic information contained in the ROD and FEIS in this case sufficiently addresses the economic impact of the Travel Plan. The studies and information utilized by the Forest Service, while somewhat dated now, satisfy NEPA's demands.[10] The additional studies suggested by Plaintiffs are unnecessary. The modeling methods of economic impacts used in the FEIS are described and discussed, as well as the weaknesses and limitations of those analysis methods. (AR 2673-74.) The FEIS lays out the economic impact areas, including both Counties that are Plaintiffs in this case, as well as the populations, income, and other key economic factors for the areas impacted. (AR 2668, 2676.) Motorized trail use participation rates, outdoor recreation, tourism needs, and various types of visitor uses and numbers to the CNF are also discussed. (AR 2690-2705.) The FEIS concludes that, in its assessment of the potential economic impacts of the Travel Plan on regional economic systems, "the overall economy of the local area has multiple recreation attractions and is robust enough that the proposed changes will be regionally

---

[10] The Court notes that the FEIS was issued in August of 2011 and five years passed between its issuance and the briefing being filed on these Motions. The data and reports used in the 2011 FEIS were, at the time the FEIS was issued, more current than they may seem now.

insignificant although they will likely be felt in very specific segments of the local economy (e.g., the Arts, Entertainment and Recreation Sector)." (AR 2708-09.) The FEIS then describes how each alternative might impact the economy. (AR 2709-13.)

While Plaintiffs may disagree with this discussion and/or desire more, the Court finds the Forest Service properly considered the economic impacts of the Travel Plan on the local communities. The Forest Service examined the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *MotorVehicle*, 463 U.S. at 43. The Court finds that explanation and decision to be reasonable and based on a consideration of the relevant factors. There has been no clear error of judgment. *Id.* Furthermore, the Forest Service is afforded deference in its choice, consideration, and analysis of technical and scientific data used in arriving at its decision. *See McNair*, 537 F.3d at 990. Therefore, the Court finds the Forest Service's decision is not arbitrary or capricious in this regard. Defendants' Motion for Summary Judgment is granted on this claim.

////////////////////////////////

////////////////////////////////

////////////////////////////////

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)      Plaintiffs' Motion for Summary Judgment (Dkt. 57) is **DENIED**.

2)      Defendants' Motion for Summary Judgment (Dkt. 65) is **GRANTED**.

DATED: June 16, 2017

Edward J. Lodge
United States District Judge